Eric C. Deters 81812
Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION AT COVINGTON

| | | |
|---|---|---|
| CAROLINE D. STEVENS, | : | Case No. |
| | : | |
| Plaintiff | : | Judge |
| | : | |
| vs. | : | |
| | : | |
| SAINT ELIZABETH MEDICAL | : | VERIFIED COMPLAINT (CLASS |
| CENTER, INC., | : | ACTION) |
| Serve: Joseph Gross | : | |
| 1 Medical Village Drive | : | |
| Edgewood, KY 41017 | : | |
| | : | |
| and | : | |
| | : | |
| DONALD SAELINGER, M.D. | : | |
| 700 Elsinboro Drive | : | |
| Cincinnati, Ohio 45226 | : | |
| | : | |
| and | : | |
| | : | |
| PATIENT FIRST PHYSICIANS | : | |
| GROUP | : | |
| 334 Thomas More Parkway, Suite 200 | : | |
| Crestview Hills, KY 41017 | : | |
| | : | |
| Serve: Donald Saelinger | : | |
| 700 Elsinboro Drive | : | |
| Cincinnati, Ohio 45226 | : | |
| | : | |
| and | : | |
| | : | |
| PHYSICIAN ASSOCIATES, LLC | : | |
| Serve: Joseph Gross | : | |
| 1 Medical Village Drive | : | |
| Edgewood, KY 41017 | : | |
| | : | |
| Defendants | : | |

1

Comes now, Caroline D. Stevens, by and through counsel, and for her Verified Complaint states as follows:

1. This is a lawsuit under federal and state law.

2. Caroline D. Stevens is a resident of Boone County and has a legal domicile of Boone County, Kentucky. She was employed with Patient First Physicians Group (PFPG) until St. Elizabeth Medical Center, Inc. (St. Elizabeth) purchased PFPG, then she became employed with St. Elizabeth. She worked during both these time periods with PFPG and St. Elizabeth directly for Donald Saelinger, M.D. as his personal assistant and as a nurse.

3. This Court has jurisdiction pursuant to the Sherman Act (15 U.S.C. § 1-7), the Clayton Act, (Id. § 12-27), and the Federal Trade Commission Act, (Id. 341-61).

4. It will also have jurisdiction under 28 U.S.C. § 1331 and 1337. This court has supplemental jurisdiction of the state law claims under 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction. Venue is proper in this district pursuant to 15 U.S.C. § 15 and 22 and 28 U.S.C. § 1391(b) and (c). During the time of these events, Defendants resided, transacted business and had agents in this district.

5. Plaintiff seeks class action status under Federal Rule of Civil Procedure 23. The mandates of Rule 23 apply to this matter.

6. Defendants have conspired to suppress competition in Northern Kentucky including health care job opportunities.

7. Defendants control and completely dominate a health care market by virtue of violations of the statutory provisions of paragraph three (3).

8. St. Elizabeth, by their own bragging, owns all the hospitals in Northern Kentucky, a

2

skilled nursing unit, several freestanding outpatient facilities, a home health/hospice agency, a family medicine residency program, Summit Medical Group, Patient First Physicians Group and boasts a medical staff of over 700 physicians. All of which, on the surface alone, not an issue.

9. In fact, other than independent Urgent Cares, St. Elizabeth, has a real, direct and virtual monopoly on healthcare in Northern Kentucky, which is a large geographical and populated region.

10. In the attached "Draft" dated January 5, 2007, St. Elizabeth announced Patient First Physicians Group would join St. Elizabeth Medical Center. (Exhibit 1)

11. The Draft bragged Patient First was a 66 member physician practice with 12 offices throughout Northern Kentucky.

12. The document continued:

"Joseph Gross, President and CEO of St. Elizabeth Medical Center, said, "Partnering with Patient First is a great opportunity for St. Elizabeth to work more closely with a high quality, well-established, and successful physician practice. With greater cooperation between providers, we can strategically plan together to reduce duplication of services and reduce costs while expanding the geographic reach of our physician and outpatient services network, especially in Boone, Campbell and Pendleton counties. Working more closely with physicians is an imperative for hospitals in order to continue improving the quality of care for the community."

The focus is always a claimed "improvement of the quality of healthcare." Absent from this public release is the word or variation of the word competition.

13. This document claimed: "Just over half of the 380,000 residents of Northern Kentucky seek primary care service from a Patient First primary care provider." (It's believed the other half receive it from Summit Medical also owned by St. Elizabeth Medical Center.)

3

14. In the Q&A attached to the Release (Exhibit 2), it is stated in part:

"Patient First and St. Elizabeth will share in the future earnings of the group"

"Q. Will Patient First Physicians be required to send their patients to St. Elizabeth?

A. Patient First Physicians can maintain privileges at any hospital they choose and may refer patients where they choose."

(Plaintiff maintains this is a farce. Patient First Physicians are expected to refer patients to St. Elizabeth, they simply don't admit because of violation of law. In addition, they in fact focus referrals to St. Elizabeth and all of Northern Kentucky's hospitals are owned by St. Elizabeth.)

15. Then on the Q&A the admission of the purpose of the "merger:"

"With cooperation among providers **rather than competition**, unnecessary duplication of services can be reduced, while access to needed services can be expanded."

This is a clear admission of the anti-competitive purpose of the merger. In addition, Exhibit 2 was not a public released document. It was to explain the deal to the principals.

16. There is also a "Summit Medical Group Questions "where there is a denial they will be grouped with Patient First." Yet, they are both owned and controlled by St. Elizabeth.

17. The attached document titled: SEMC Annual Management Evaluation dated December 2, 2007 by Donald Saelinger MD (VP SEMC, CEO and Chairman PAL and PFPG) is remarkable. (Exhibit 3) PAL is Physicians Associates, LLC.

18. There is a plan to integrate according to Exhibit 3: "I expect we will have a plan of integration early in 2008 and expect that the process will be complete by the end of the year 2008."

19. The intent of complete monopoly is stated: "Completion of the PFPG and SMG (the two PCP groups) integration will set the stage for additional integration especially with certain specialty

4

groups." "I believe this vision is shared by Joe Gross and the SEMC board of directors and has been my personal vision for nearly 30 years."

20. Further evidence of the control continues in the document with imaging, laboratory and physical therapy for PFPG becoming one under St. Elizabeth.

21. Further evidence of the intent is the Patient First Gastroenterology section integrating with Tristate and St. Elizabeth. It states further: . . . "it is desirable for SEMC to own the ASC so that SEMC and the GI doctors can attain hospital reimbursement rates."

22. More evidence of antitrust violations are contained in this evaluation prepared by Donald Saelinger, M.D. for Joseph Gross:

"Since the PAL and SEMC merger, PFPG and PAL have become separate entities with separate boards however the physician representation of the boards are the same." The separate boards is a farce. St. Elizabeth controls all.

23. More evidence of antitrust violation is contained in Exhibit 3:

"We have made no effort to move patients from St. Luke East or West anticipating the hospital merger." Intreputation, no merger, there would have been an illegal redirection of patient care to St. Elizabeth.

24. There is also a discussion of the integration of the diabetes center in Exhibit 3. This Diabetic Center is now owned and operated by St. Elizabeth as of January 1, 2010.

25. More evidence of anti-trust is contained in Exhibit 3. Paragraph 9. Retail Clinics is remarkable for anticompetitive evidence. There are clear anticompetitive acts:

> "The Northern Kentucky health care market will have 18 of these so called retail clinics by the end of the first quarter of 2008. I believe that this represents the single most significant threat to primary care doctors that has ever been experienced. Dr. Prichard and I along with our respective groups

5

have spent a great deal of time attempting to develop a strategy to deal with these clinics.  Currently there is no easy way to disrupt or discourage these clinics from operating successfully.  A plan to open more after hours clinics to compete with their success is in progress. . I have also brought organized medicine (KMA and AMA) and the Chamber of Commerce into this debate to elicit political help to discourage the success of these retail clinics.  This involves the limiting of the scope of practice of nurse partitions (NP's usually operate these facilities)."

This paragraph of Dr. Saelinger leads like a mob or counter or terrorist memo:

"so called"
"single most significant threat:
"develop a strategy to deal'
"no easy way to disrupt or discourage"
"elicit political help to discourage"

Dr. Saelinger is organizing the KMA, AMA Chamber of Commerce and politicians to strike out competition he admits is the "single most significant threat."

26. An all out war is declared on Urgent Cares.  And, in the political battle, the Boone County Judge Executive Gary Moore is on the St. Elizabeth Board of Trustees.

27. Donald Saelinger as reflected by this document is the CEO of PAL and PFPG and Chairman of both boards.

28. Donald Saelinger admits he functions best "in getting physicians to align incentives and move in lock step."

29. Donald Saelinger was and/or is CEO and Chairman of Patient First Physicians Group (PFPG), Vice President of St. Elizabeth Medical Center and CEO and Chairman of Physicians Associates, LLC.

30. Ken Folz was and/or is COO and CFO of PFPG.

31. Jim Korb was and/or is HR Manager of PFPG.

6

32. Joey Chandler was and/or is Clinical Manager of Patient First.

33. Gary Brown was supervisor or Site Manager for the Patient First Southgate office where Plaintiff worked.

34. Joseph Gross is the President/CEO of St. Elizabeth Medical Center, Inc., now called St. Elizabeth Healthcare, and sole member of PAL.

35. The attached letter dated January 11, 2010 from Ken Folz confirms Denise Stevens (Plaintiff) termination as of December 18, 2009. (Exhibit 4)

36. Plaintiff wanted to be a nurse from the time she was three years old.

37. From three until later childhood for example, she requested a nurse kit for Christmas.

38. Of the thirteen graduates of Thomas More College's, inaugural nursing class, BSN Program in 1982, Plaintiff finished first in her class on the National RN Nursing Board Exam.

39. The attached resume details her nursing career. She has been a RN since 1982. Dr. Donald Saelinger claimed she was the best nurse whoever worked for him.

40. Defendants have, as reflected by their conduct, engaged in mean, unethical dishonest, retaliatory, illegal and despicable conduct towards Plaintiff.

41. Plaintiff was and is an outstanding nurse. She has been treated unlike any of her peers; treated by a different standard than Dr. Saelinger; and Defendants have not even been satisfied by that - they wanted resignation, humiliation, no jobs, no future, no unemployment benefits.

42. On October 26, 2009, the attached letter was sent to Gary Brown, Jim Korb and Dr. Saelinger from Caroline D. Stevens. Defendants retaliated against Plaintiff for this letter. The letter is self explanatory. Plaintiff wants Defendants to back off, let her do her job. (Exhibit 5.)

43. A personal relationship began between Dr. Saelinger and Caroline D. Stevens May or

7

June, 2007. By personal, intimate and sexual. The only reason Plaintiff entered this relationship is Dr. Saelinger's promise he was divorcing and he and Plaintiff would be married. Plaintiff's divorce was already in progress.

44. On June 23, 2007, Dr. Saelinger gave Plaintiff what is called a past, present and future diamond pendant just before their first sexual encounter at the Airport Marriott.

45. Dr. Saelinger from the inception of the relationship until present frequently asked Plaintiff to not stop loving him.

46. Plaintiff has saved all text messages, voicemails (being transcribed) and emails.

47. Plaintiff made it clear to Dr. Saelinger she would never be his mistress and would never be involved with him unless he truly was leaving his wife and they would have a future. Plaintiff would like to stress that this is not a situation of someone merely promising there would be a divorce. She was told the divorce was filed, the names of lawyers and told of events during the Court process. She relied upon these false misrepresentations by being in and staying in the relationship with Dr. Saelinger.

48. On October 18, 2007, Dee Saelinger, wife of Dr. Saelinger, actually pulled the prior described necklace off Plaintiff, at an unfurnished apartment Dr. Saelinger had secured for Plaintiff and him. Plaintiff placed a 911 call and a police report was made. Dee Saelinger showing up was a shock to Plaintiff because she thought a divorce was in progress. Dr. Saelinger continued to maintain that divorce was in progress and Plaintiff trusted him.

49. Dr. Saelinger told Plaintiff there was a restraining order against Dee to stay away from Plaintiff and her family after October 18, 2007. This too, a lie. Plaintiff told Dr. Saelinger she may press charges and hire an attorney. This lie by Dr. Saelinger was to keep Plaintiff from doing so.

8

50. Dr. Saelinger told Plaintiff police officers paid Dee a visit at her work at the VA Hospital. This too, a lie.

51. Dr. Saelinger told Plaintiff after the October 18, 2007 incident his lawyer told him he and Plaintiff needed to lay low for three to four weeks. This too, a lie.

52. Dr. Saelinger placed several attorney meetings on his schedule knowing Plaintiff would see the schedule. This too, a lie.

53. Dr. Saelinger told Plaintiff his therapist thought Dr. Saelinger and Plaintiff were about sex at first, then later love. Plaintiff has no idea if Dr. Saelinger even saw a therapist.

54. Dr. Saelinger gave Plaintiff a set of Tiffany pearls for Christmas 2007 and was told she was to wear them at their wedding.

55. Plaintiff stressed repeatedly to Dr. Saelinger she did not want to be involved with a married man.

56. Plaintiff and Dr. Saelinger often attended church together in Cincinnati at St. Peter and Chains. Dr. Saelinger would use God and spiritual talk with Plaintiff to keep her with him when she complained about waiting for the divorce to be over.

57. Dee Saelinger and Plaintiff would later have a conversation. And Dee told Plaintiff on August 12, 2009 that she (Plaintiff) was not the first affair. Dr. Saelinger had been involved with at least one other of his nurses, Joey Chandler, and Dr. Saelinger confirmed that to the Plaintiff. Plaintiff was shocked. In addition, Dr. Saelinger told Plaintiff when he discussed the situation with Joseph Gross, Joseph Gross informed him he had "a similar" situation. Plaintiff believes there is a "good ole boy" environment at St. Elizabeth when is a double standard for the men. In light of the basis for the "claimed" discharge, Plaintiff looks forward to discovery on finding out which <u>men</u>

9

working for Defendants have had "sex" on the "premises" and <u>not</u> been discharged.

58. Dr. Saelinger and Plaintiff during the course of their relationship spoke about getting their marriages annulled in the Catholic Church so they could get married in the church.

59. In the summer of 2009 and earlier, Dr. Saelinger asked Plaintiff her ring size and would draw a ring around her finger with a pen. This happened on several occasions.

60. Near the time of Plaintiff's termination, Dr. Saelinger told Plaintiff that if he were ever to make love to her again, it would be at a time that he could do so every day for the rest of his life.

61. Plaintiff always told Dr. Saelinger she had no interest in being his mistress.

62. Plaintiff has preserved <u>all</u> her text messages and emails with Dr. Saelinger. (Those that were not already deleted due to phone memory.)

63. Physician Associates, LLC and/or St. Elizabeth Healthcare challenged Plaintiff's unemployment under false pretenses Plaintiff was being discharged for misconduct. Plaintiff has appealed a denial. Plaintiff was told she was being discharged for violating policy by consenting to have sex on the premises of PFPG with Dr. Saelinger. Dr. Saelinger told Plaintiff it was the talk in the office about Dr. Saelinger's and Plaintiff's relationship and that Plaintiff could not discuss any of it. Plaintiff maintains she is a victim of retaliatory discharge and was refused a response or conclusion to her letter at the time of discharge.

63. Physician Associates, LLC failed to return to Plaintiff one of her stethoscopes. Plaintiff had 2 stethoscopes at work. The one not returned was frequently borrowed by other staff. Plaintiff brings a claim here for simple conversion.

64. A review of correspondence between Dr. Saelinger and Plaintiff supports the claims of Plaintiff. On December 9, 2006, Dr. Saelinger emailed Plaintiff a message which included these

words: "the past year and a half have been very good for me, perhaps the best in my professional life and much of that is your doing and I thank you.  Denise you are a friend, a good nurse and a good person."

65. On January 8, 2007, Dr. Saelinger emailed Plaintiff a message which included these words: "Again thank you for your help and loyalty.  I suspect that you do not understand how much you help me and I appreciate it."

In this email Dr. Saelinger speaks of a speech, press release, meeting of the board and doctors.

66. On June 3, 2007, Dr. Saelinger emailed Plaintiff and detailed how he and his wife were "dividing up the stuff issue" and "our difficulties and plans are not public knowledge."  At the same time, Dr. Saelinger said he wanted to get "on the top of your (Denise's) dance card."  He asked her to dinner, out of town and to Vegas.  Plaintiff asserts this was the first direct date request.

67. Dr. Saelinger has <u>not</u> been fired by Defendants.  As of January 29, 2010, he was still seeing patients.  And Dr. Saelinger has <u>not</u> even filed for divorce from Dee Saelinger although he said he filed twice.

68. On July 10, 2007, Dr. Saelinger emailed Plaintiff a website of a bed and breakfast in Bardstown where: "this could be the place where we become irreversible life time lovers and soul mates.  I love you."  This would, per Dr. Saelinger "Seal the deal."

69. On June 17, 2007, Dr. Saelinger emailed Plaintiff where he revealed he told his son all about Plaintiff.  He also wrote: "He was surprised that I had not been further along with my divorce than I am since he (new)(misspelled) it has been going on for while.  He also expressed his love.  This too, a lie.

70.    On June 16, 2007, Dr. Saelinger emailed Plaintiff claiming he spoke to Sarah, his daughter, about Plaintiff and that "you came onto the scene after divorce in progress." He expressed his love and "Of course there is risk associated with that and you know life is a series of risk management exercises and this risk is worth it." This too, a lie.

71. These emails came from Dr. Saelinger's office address at the Patient First email account.

72. On June 16, 2007, Dr. Saelinger sent his first "love you" in an email.

73. On June 11, 2007, Dr. Saelinger sent an email where he writes: "Since inviting you to my home is not a good idea right now (this is a short term problem and I will explain that to you) and since I suspect we both wish some privacy and perhaps some "bubbles" (you bubbles come to the top faster I know) and a private dinner, and perhaps a dance or two, would you consider spending our time is (misspelled) a suite at the Cincinnatian." Plaintiff was taken to Dr. Saelinger's home one time before having dinner. Wanted to see if Plaintiff liked the house. If so, he would try to keep it after divorce. This too, a lie.

74. Dr. Saelinger has continued sending messages by text and email to Plaintiff after she was discharged and she has not responded. This causes great anxiety for Plaintiff.

75. Dr. Saelinger on June 13, 2007 by email, claimed he has not had "such feelings ever in 60 years of my life and I like it and of course that is another one of those things that you may choose to believe or not."

76. In May or June, 2007, Dr. Saelinger emailed Plaintiff and wrote: "I cannot wait to hold you again and to make love to you. I cannot believe this is as good as it is. I guess that this old man is a little short sighted in certain areas of life, possibly because he has spent al his time helping others with their life and health issues." He expresses his love.

12

77. In May or June 2007 over dinner at the Celestial, Dr. Saelinger told Plaintiff he thought he loved her for the first time. He also told Plaintiff that whatever happened between them, work would not be affected by their relationship. This too, a lie.

78. Dr. Saelinger told Plaintiff that he had a prenuptial agreement with his wife which was drawn up by his brother. Plaintiff has no idea.

79. On July 24, 2007, Dr. Saelinger sent an email to Plaintiff and stated: "look forward to seeing you and being with you this weekend and forever. You are my perfect woman." This too, a lie.

80. On July 26, 2007, Dr. Saelinger sent Plaintiff an email and stated: "My business and patient life has always been conducted to the highest standard of integrity and that has been at the expense of my personal life." This too, a lie.

81. On July 30, 2007, Dr. Saelinger sent an email to Plaintiff where he stated:

> "Next week I must decide whether I am to sell the house and move or stay in the house for at least the near future or until it is time for us to live under the same roof. We then will need to decide whether I move to temporary quarters or buy a permanent residence where you and I and your children would be comfortable living, presumably in Boone County." This too, a lie.

82. On July 31, 2007, Dr. Saelinger sent Plaintiff an email where he said they could "see the house and have dinner. If it makes sense to you perhaps we can spend the night, but we can talk about that."

83. On August 2, 2007, Dr. Saelinger sent Plaintiff an email suggesting a house visit to help him decide to sell it (April to October). "If the decision is to sell the house, I will try to sell it for about 4 weeks without a real estate person and if it does not sell, will get Huff to sell it. The purpose is in no way to try to convince you that you should live in Ohio when we ever get our act together

13

and I am not pushing you on a time line and I promise never do that. I know you are a Boone County lady and that is ok with me." This too, a lie.

84. On August 26, 2007, Dr. Saelinger sent Plaintiff an email and said Dee after a "lengthy somewhat contentious conversation she believes it is in her best interest to stay in the house and that is fine with me. Several items need to be resolved and she understands that she has to have all of these things resolved and a final decision by Labor Day." This too, a lie.

85. On August 30, 2007, Dr. Saelinger sent Plaintiff an email that is worthy of attachment. He states his love and closes with: "Denise if you are "on board," I am also and we are heading to October 2008." (Exhibit 6) this was to be the wedding date. This too, a lie.

86. On September 9, 2007, Dr. Saelinger sent Plaintiff an email that is worthy of attachment. It states: "I will be finding an apartment or condo today, the first step in getting our lives together. This will give us a place to go and time to plan our lives together in a way that is good for all stakeholders (you and me, your children, my children, Don Stevens and Dee, and our business associates?) (Exhibit 7). This too, a lie.

87. On September 27, 2007, Dee had photos taken of Dr. Saelinger and Plaintiff together. (Dee allegedly hired a detective to follow DAS, take pictures and hack into DAS business home computer.) Plaintiff believes Dee violated HIPPA laws.

88. On October 18, 2007, Dee and a man followed Dr. Saelinger and Plaintiff to the apartment and took pictures. The attached email summarizes the details it included a revelation by Dee that she and Dr. Saelinger had sex on October 17, 2007 and October 18, 2007, and that Dee's last words leaving the apartment were: "No divorce. I will destroy you." (Exhibit 8) Dr. Saelinger would lie about it all to convince Plaintiff to remain with him.

89. On November 9, 2007, Dr. Saelinger sent Plaintiff an email and gave details of the divorce and the names of the lawyers. (Exhibit 9) This too, a lie.

90. On November 16, 2007, Dr. Saelinger sent Plaintiff an email stating in part: "Our difficulty being together will be short lived."

91. On November 22, 2007, Dr. Saelinger sent Plaintiff an email stating in part:

> "Denise, have a great day and if all goes well, we will be together next year at Thanksgiving. I may even smoke a cigarette with your mother."

92. On November 23, 2007, Denise explained the situation to her friend by email. She explains Don says they are in a "black out period," but he's committed. (Exhibit 10) This too, a lie.

93. On November 30, 2007, Dr. Saelinger sent Plaintiff an email and picked October 25, 2008 as Plaintiff's and Dr. Saelinger's marriage date. (Exhibit 11.) This too, a lie.

94. By email December 15, 2007, Dr. Saelinger informed Plaintiff his divorce will be final February or March, 2008. This too, a lie.

95. Dr. Saelinger informed Plaintiff in December 2007, that on January 11 a judge would decide whether Dee could pursue a case for "adultery.' This too, a lie.

96. By email January 11, 2008, Dr. Saelinger told Plaintiff he will move forward with Plaintiff. He also wrote: "With regard to you, I am sorry for the pain and the broken promises that I have bestowed on you." This too, a lie.

97. In January 2008, Dr. Saelinger told Plaintiff a mediator to settle the divorce was being appointed and the divorce will be over soon. This too, a lie.

98. Plaintiff was separated from Don Stevens on May 15, 2007 and divorced finalized on August 20, 2008. (Married for 28 years.) He is fully aware of the Dr. Saelinger relationship and

is supportive of Plaintiff.

99. In January 2008, Dr. Saelinger told Plaintiff Dee wanted Dr. Saelinger to move in with Plaintiff.  This too, a lie.

100. On January 24, 2008, Plaintiff sent Dr. Saelinger an email and expressed it might be better for them if she pursued another job.  (Exhibit 12.)  This is important.  The opportunity at this time for Plaintiff to be reemployed at another provider was good.  Plaintiff relied on Dr. Saelinger in not doing so.

101. By March 2008, Plaintiff and Dr. Saelinger decided it best they not see each other.  Dr. Saelinger promised Plaintiff to "take care of the conflicts which are keeping us from pursuing a life together."  This too, a lie.

102. On March 15, 2008, Dr. Saelinger sent Plaintiff an email and referenced gathering documents for the FTC for the St. Luke St. Elizabeth merger.

103. On March 27, 2008, Dr. Saelinger sent Plaintiff an email stating in part:

"During this difficult time, I hope that we can periodically have closeness and intimacy, something necessary, I believe, to keep us connected so that when we are full speed ahead we can go fast toward our ultimate goal."

104. On March 28, 2008, Dr. Saelinger references a meeting with Joe Gross and concluded:

"I will be finishing off my plan to get our lives together and will spend much time on that this weekend.  I love you and miss you so much.  I cannot imagine life without you.  You are my "perfect mate.  Love you Don."

105. Dr. Saelinger informed Plaintiff he was seeing a psychiatrist.

106. In April 2008, Dr. Saelinger and Plaintiff had dinner and he promised to move forward. He told Plaintiff his final hearing was June 2, 2008.  This too, a lie.

16

107. By August 2008, Dr. Saelinger was still putting off Plaintiff although continuously professing his love and desire to marry her.  (See email attached from Plaintiff to her friend.) (Exhibit 13)

108. On April 24, 2008, Dr. Saelinger sent the attached sexual nature picture to Plaintiff. (Exhibit 14)

109. On June 17, 2008, Dr. Saelinger sent Plaintiff an email and said the decree for the divorce would be this week and joked Plaintiff and Dr. Saelinger could get married next week. (Exhibit 15)

110. On June 21, 2008, Dr. Saelinger and Plaintiff exchanged the attached emails.  Plaintiff expresses concern about what is going on.  (Exhibit 16.)

111. On September 1, 2008, Dr. Saelinger and Plaintiff had lunch and spoke of traveling to Tuscany to get married.

112. On November 7, 2008, Dr. Saelinger sent Plaintiff an email about orgasms.  (Exhibit 17)

113. Dr. Saelinger told Plaintiff he went to trial in late October early November, 2008 and a meeting was scheduled. He details things to Plaintiff.  There was no Trial.  (Exhibit 18.)  This too, a lie.

114. By December 2008, Plaintiff was trying to get away from Dr. Saelinger as far as a relationship, but he pursued.  (Exhibit 19.)

115. On December 28, 2008, Dr. Saelinger sent Plaintiff an email.  He spoke of her wonderful work and still plans for divorce.  He on December 29, 2008 grabbed her in a stairwell to hug and kiss her.  He seemed desperate to do this.  Plaintiff was stunned and somewhat frightened

as she had told him that she wanted distance until he was divorced.  (Exhibit 20.)

116. Around this time, Dr. Saelinger told Plaintiff he went to the attorney's house got him out of bed and told him to get the divorce done.  (This allegedly happened morning of January 1, 2009.)  This too, a lie.

117. The attached January 2, 2009 email is self explanatory.  Dr. Saelinger wanted to continue the relationship.  (Exhibit 21.)

118. On February 8, 2009, Dr. Saelinger sent Plaintiff the attached unsolicited email. (Exhibit 22.)

119. On February 14, 2009, Dr. Saelinger sent Valentine wishes to Plaintiff.  (Exhibit 23.)

120. On February 25, 2009, Dr. Saelinger sent an email from Washington, D.C.  (Exhibit 24.)

121. On February 26, 2009, Dr. Saelinger responds to Plaintiff's "silent treatment."  (Exhibit 25.)

122. On March 2, 2009, Dr. Saelinger sent Plaintiff the attached unsolicited email.  (Exhibit 26.)

123. On May 9, 2009, Plaintiff sent Dr. Saelinger the attached email expressing disappointment in his broken promises.  (Exhibit 27.)

124. On May 11, 2009, Plaintiff explained to Dr. Saelinger expressing new rules - no intimacy.  (Exhibit 28.)

125. In May 2009, Dr. Saelinger told Plaintiff Dee's furniture was being moved out of the house by Court order.  This too, a lie.

126. On June 18, 2009, Dr. Saelinger sent Plaintiff the attached unsolicited email.  (Exhibit 29.)

127. In August 2009, Plaintiff discovered Dr. Saelinger was a liar about the divorce and the trial. Dee was living in the house. And on August 20, 2009, sent the attached email to Dr. Saelinger. (Exhibit 30.) The attached email to Plaintiff's friend summarized how Plaintiff found out about the lies. (Exhibit 31.)

128. On October 2, 2009, Plaintiff described by email the pressure she was receiving to move from her job. (Exhibit 32.) This prompted Exhibit 5.

129. Dr. Saelinger sent Plaintiff a Happy New Year email and text message of same on New Years eve as well as Christmas Eve and day 2009.and an email January 15, 2010. (Exhibit 33.)

130. St. Elizabeth claims they complete mergers to further the quality and "coordination" of health care.

131. In reality, St. Elizabeth Healthcare has a complete healthcare monopoly in Northern Kentucky. Urgent Cares are the only provider outside their control and St. Elizabeth is by their own admission assaulting those.

132. St. Elizabeth is accomplishing their goal to eliminate competition to the detriment of doctors, employees and consumers who lose all options of employment or medical treatment in Northern Kentucky. Plaintiff is aware of doctors not being happy with the "monopoly" and doctors feel that Dr. Saelinger sold them out.

133. The attached documents support these allegations.

134. St. Elizabeth has taken over St. Luke, Patient First, Summit Medical and other affiliates.

135. Plaintiff has filed the attached EEOC Complaint and is requesting an immediate right to sue letter to file a federal sexual harassment complaint. Which will be accomplished in the next thirty days. (Exhibit 34.)

19

136. Plaintiff and Dr. Saelinger had a consensual relationship under false pretenses, but after the consensual relationship ended, Dr. Saelinger sexually harassed Plaintiff by creating a hostile work environment. Defendants had an attorney, Debbie Adams, from Frost Brown Todd, interview Plaintiff while she was still employed and the interview focused on the "consensual" relationship.

137. The harassment by Dr. Saelinger culminated in tangible employment action against Plaintiff.

138. The tangible employment action was a request to transfer or lose full time position, changing hours and ultimately discharge.

139. All the power of Defendants came to bear upon Plaintiff and inflicted direct economic and emotional harm. Defendants are nothing less than corporate bullies.

140. Plaintiff lost a $47,500 a year salary based upon 37 hour week average and benefits of medical, dental, disability and life insurance.

141. Defendants threatened termination of Plaintiff to try to force her to accept an undesirable reassignment.

142. As to the sexual harassment, Defendants are strictly liable.

143. The attached "Severance Agreement and Full and Final Waiver, Release and Dismissal of All Claims" was given to Plaintiff to accept and sign as part of a termination. (Exhibit 35.) It speaks for itself. The highlighted portions are most relevant. In summary, the Defendants collectively attempt to:

    a.    Control Plaintiff's future employment by forbidding employment within the St. Elizabeth monopoly, both present and future entities..

    b.    Control all the Defendant's reputations without regard for Plaintiff's

reputation.

c.    Keep all the mess confidential including that which may not be known at this
time.

d.    Keep all the mess secret.

e.    Deny culpability.

f.    Insult Plaintiff with a <u>neutral</u> reference for her work and dedication as a
Patient First (Dr. Saelinger's) nurse despite Plaintiff being an outstanding
employee.

g.    Releasing all claims, past, present and future..

144.    The attached is the St. Elizabeth Healthcare Code of Conduct.  The relevant sections
to this matter are highlighted.  (Exhibit 36.)

145. St. Elizabeth <u>claims</u>: "We accept patient referrals and admissions based solely on our
patients' clinical needs and our ability to render the needed services."

<u>**COUNT I - ANTITRUST VIOLATIONS**</u>

146. Plaintiff adopts and incorporates each and every allegation of this Complaint.

147. Under the Sherman Act, the Clayton Act and Federal Trade Commission Act,
Defendants have engaged in an ongoing price fixing conspiracy in the healthcare market in the
Northern Kentucky region with the purpose and effect of limiting healthcare services with the intent
to raise and raising prices, thereby causing injury to Plaintiff and other persons in the Northern
Kentucky region.  Plaintiff is a user of healthcare services in Northern Kentucky.

148. Defendants anti-competitive activities are per se violations of Section 1 of the Sherman
Act, 15 U.S.C. § 1.

149. As a direct result of Defendants unlawful conspiracy, Plaintiff and other persons in the Northern Kentucky region have been and will be overcharged for healthcare services. In addition, those working in the healthcare field, have two choices - work for St. Elizabeth or in Cincinnati.

150. An example of the anti-competitive and economic issues here is the Cincinnati Health Alliance. It was and is a disaster. In fact, St. Elizabeth has withdrawn from its own alliance in Cincinnati.

151. It is believed that any safe harbor provisions or government approval or acquiesce in these mergers in Northern Kentucky were not fully apprised of the <u>facts</u> contained in these hospital memorandums. Dr. Saelinger was during these events, the Vice President of St. Elizabeth. This Complaint is being sent to the U.S. Justice Department and the Kentucky Attorney General to be pursued on behalf of the public.

## COUNT II - SEXUAL HARASSMENT

152. Plaintiff adopts and incorporates each and every allegation of this Complaint.

153. Under Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000 et. seq. (Title VII) and Kentucky Revised Statutes § 344.040. Plaintiff has suffered sexual harassment at the hands of Defendants.

## COUNT III - FRAUD

154. Plaintiff adopts and incorporates each and every allegation of this Complaint.

155. Dr. Saelinger's statements and intentional actions towards Plaintiff, were material representations which were false.

156. Dr. Saelinger knew that the above mentioned statements were known to Plaintiff to be false or were made recklessly.

157. Dr. Saelinger made the material representations with inducement for Plaintiff to act upon them.

158. Plaintiff acted in reliance on the truth of the above mentioned false material representations, and acting in reliance on these material representations caused Plaintiff severe emotional injury.

## COUNT IV - RETALIATORY DISCHARGE

159. Plaintiff adopts and incorporates each and every allegation of this Complaint.

160. Defendants retaliatory discharged Plaintiff under false pretenses of a policy violation not found in the policies.

## COUNT V - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

161. Plaintiff adopts and incorporates each and every allegation of this Complaint.

162. Defendants actions in firing Plaintiff and publicizing their firing were either intended by Defendants to cause emotional distress to the Plaintiff or were such that Defendants should have known they would cause such emotional distress and clearly exceeded the bonds of common decency as would be observed in any civilized community.

163. Defendants' conduct towards Plaintiff was willful, wanton and malicious, and was carried out both with a flagrant indifference to the rights of the Plaintiffs and with a subjective awareness that such conduct would result in harm, for which Defendants are answerable in punitive damages.

## COUNT VI - GENDER DISCRIMINATION

164. Plaintiff adopts and incorporates by reference each and every allegation in the Complaint.

165. Defendants discriminated against her based upon her gender, as a femail.

## REQUEST FOR CLASS CERTIFICATION

166. Plaintiffs incorporate each and every allegation in the paragraphs above and further state:

167. The claims or defenses of all the representative members are typical of all parties of the class. The members of the class are users of hospital services and PCP in Northern Kentucky and all those working in the health care field, trying to work in the health care field or planning to work in the healthcare field in Northern Kentucky. Plaintiff represents all members of the class.

168. The representative parties will fairly and adequately protect the interest of the class.

169. The prosecution of separate actions by each member of the class would create inconsistent or varying adjudications with respect to individual members of the class.

170. The questions of law or fact common among the class members predominate over any questions affecting only individual members.

171. As a result of the foregoing Plaintiffs request class status

## JURY DEMAND

172. Plaintiff demands a trial by jury, pursuant to Rule 38 of the Federal Rules of Civil Procedure, of all issues triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands:

1. Defendants' unlawful conspiracy alleged herein be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation the Sherman Act; the Clayton Act and the Federal Trade Commission Act.

2. Plaintiff recover actual damages incurred as a result of the behavior of Defendants, in an amount to be determined at trial;

3. Plaintiff recover punitive damages, as provided by law, in an amount to be determined at trial;

4. The Court, pursuant to federal antitrust laws, award Plaintiff treble the damages sustained by Plaintiff;

5. The Plaintiff recover her costs of this suit, including reasonable attorney's fees as provided by law;

6. This matter be certified as a class action.

7. For a trial by jury.

8. Plaintiff be granted such other, further and different legal and equitable relief as the nature of the case may require or as may be determined just and appropriate by this Court.

/s/ Eric C. Deters
Eric C. Deters (81812)
Attorney for Plaintiff
ERIC C. DETERS & ASSOCIATES, P.S.C.
5247 Madison Pike
Independence, KY 41051-7941
859-363-1900   Fax: 859-363-1444
Email: eric@ericdeters.com

## VERIFICATION

The Plaintiff has reviewed this Complaint. She has also provided the facts to counsel on which the Complaint is based. She attests to these facts and this Complaint under oath.

_Caroline D. Stevens_
Caroline D. STEVENS

STATE OF KENTUCKY          )
                           ) ss:
COUNTY OF KENTON           )

**SUBSCRIBED, SWORN TO AND ACKNOWLEDGED** before me, a Notary Public, by **DENISE STEVENS** on this the _2nd_ day of February, 2010.

_Loretta Little_
Notary Public
My Commission Exp.:_12-5-2011_

Q:\Stevens, Denise\Complaint - Class Action.wpd

26